UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY C. ALLEN, | |
| Plaintiff, | CIVIL ACTION NO. 3:25-cv-02078 |
| v. | (SAPORITO, J.) |
| SERGEANT D.W. WASHINGTON, *et al.*, | |
| Defendants. | |

## MEMORANDUM

Plaintiff Anthony Allen has filed a *pro se* complaint alleging that 19 defendants affiliated with SCI-Camp Hill engaged in a "campaign of retaliation and harassment" against him. Pursuant to 28 U.S.C. § 1915A, the Court will permit Allen to proceed on various First and Eighth Amendment claims against seven defendants, but dismiss all other claims.

I. BACKGROUND

The body of Allen's complaint (Doc. 1) is essentially a list of discrete actions allegedly taken by numerous prison employees over roughly 18 months, some of which have no apparent connection to the underlying claims. For brevity, the Court's summary is generally limited to the

allegations that indicate some plausible relevance to the claims.

### A. Initial Grievances

Allen alleges that "the campaign of retaliation and harassment by defendants began" on April 4, 2023, when he filed a grievance against CO Weber for "watching TV in violation of" the Pennsylvania Department of Corrections Code of Ethics. His next allegation is that on May 20, 2023, COs Washington and McGee "held [Allen] back" from afternoon yard, although Allen does not explain the context for this incident or how it relates to the rest of the case.

On June 4, during security rounds, CO A. Brown entered Allen's cell and removed a towel from the bottom of his cell door, which Allen had been using "to block mice from entering." When Allen "ask[ed] why?", Brown allegedly "produce[d] his OC spray," although the complaint does not say whether he deployed the spray.

On July 3, Allen filed a grievance about the incident with Brown. On July 26, he filed a grievance concerning "tint on [Restricted Housing Unit] windows," which restricted the sunlight and prevented Allen from seeing outside. On August 19, Allen filed another grievance after another inmate told him that Washington "threw [Allen's] thermals away" when

packing Allen's belongings in advance of a transfer to the RHU.

### B. August 21 Disciplinary Sanction

On August 21, during a phone call with his aunt, Washington allegedly approached Allen before the end of his allotted time and ordered Allen to hang up. Before Allen could respond, Weber arrived on the scene, "shaking his OC spray," and said: "Last time[,] Allen." An argument ensued, during which Weber told Allen "you have to follow the rules," to which Allen replied: "F*** the rules." Weber then told Allen: "Pack your sh*t." Allen was escorted to the RHU, where he was allegedly issued a misconduct report with "trumped up charges." A hearing was held on August 23, during which hearing officer Schreck allegedly "manufacture[d] evidence to support a guilty finding," including "false[] claims [that Allen] could be heard calling the officers 'crackers'."

### C. November 13 Confrontation

On November 13, "while wearing plastic shower shoes, [Allen] simply tried to retrieve his commissary." Allen does not explain what he means by "retrieving" commissary, but the Court infers that he was asking that a razor be produced to him. Weber asked Allen for a confiscation slip for the razor. Allen turned to a unit manager and said

"Why do they make a big issue out of everything? If they don't want me here, why don't they just kick me out?" Allen was ordered to return to his cell. He tried to continue arguing, but Washington held up his OC spray, saying "last time." At that point, CO Derioux allegedly deployed OC spray to Allen's eye and tried to tackle him. Allen "did not go down immediately." He alleges that Derioux continued to spray him, and Washington punched him in the face while Weber held Allen's arm. COs Wimer and Smith allegedly "stood at the door to [Allen's cell] and watch[ed]." After the incident, Derioux allegedly told Allen: "I'm a crack shot . . . you wanted out, well, you got your wish."

Allen allegedly suffered pain and swelling in his hand, ear, and face, from this incident. On November 17, PA Justin Rutherford ordered x-rays for Allen's swollen right hand, and allegedly said that he would order pain medication, but did not do so. On November 29, Allen was seen by an unnamed doctor, who prescribed Tylenol and said that Rutherford "must've forgot to order pain meds." Aside from these two interactions, the complaint is otherwise silent as to Allen's medical care after this incident.

Defendant M. Gourley, the Superintendent, allegedly "knew of

other occasions when DOC policy on use of force was violated" and "tolerated, encouraged, and acquiesced in a practice of excessive use of force" at SCI-Camp Hill, "through his failure to appropriately discipline those who he knew had violated DOC policy on use of force." Defendant Captain Francis, the shift commander on duty at the time of this incident, allegedly "tolerated and acquiesced in previous incidents" of excessive force, which was known to officers under his command, and thus "caused them to disobey DOC policy" on the use of force.

### D. Transfer to SCI-Greene

Allen also makes allegations relating to lost property and a transfer from SCI-Camp Hill to SCI-Greene, although his description and timeline of events are unclear. On April 23, 2024, Allen was transferred to SCI-Greene "without [any] property."[1] Property officer CO Moore was

---

[1] Allen repeatedly alleges that in 2023, his property was placed in the office of CO Benning, because Allen "did not have funds . . . at the time to cover postage." Allen does not allege that he was being transferred in 2023, and the complaint does not explain why his property was being packed for mailing. He also alleges that on August 3, 2023, Benning destroyed "22 legal books and other personal/legal property," apparently based on the fact that Benning was "the only officer name on [the] confiscated items receipt." It is unclear if the property that was allegedly lost in 2023 is the same property that he alleges should have been inventoried and shipped to SCI-Greene in April 2024.

not involved in the inventory of Allen's property, and there were no witnesses to the inventory process. On May 6, 2024, Allen wrote from SCI-Greene to Gourley about a lost box of legal paperwork, and Gourley replied: "Please send a cash slip for postage." After Allen paid, Gourley "express[ed] confusion of the issue," and Allen never received his property box. Allen claims, "upon information and belief," that C.O. Benning destroyed the property as part of a "conspiracy" with unnamed SCI-Greene officials.

## II. LEGAL STANDARDS

Under 28 U.S.C. § 1915A, the Court is obligated to screen any civil complaint in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A; *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court has a similar obligation with respect to actions brought in forma pauperis and actions concerning prison conditions. *See* 28 U.S.C. § 1915(e)(2)(B)(i); id. § 1915(e)(2)(B)(ii); 42 U.S.C. § 1997e(c)(1); *see generally Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 587-89 (W.D. Pa. 2008) (summarizing prisoner litigation screening procedures and standards).

The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1), § 1915(e)(2)(B)(ii), or § 1997e(c) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6). *Brodzki v. Tribune Co.*, 481 Fed. App'x 705, 706 (3d Cir. 2012) (per curiam); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp. 2d at 588. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195

(3d Cir. 2007)).

Allen asserts claims under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To establish a Section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). To avoid dismissal for failure to state a claim, a civil rights complaint must state the conduct, time, place, and persons responsible for the alleged violations. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Further, "[c]ivil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown . . . to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014)

(citation omitted). As explained by the Third Circuit Court of Appeals:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

## III.  DISCUSSION

Allen's complaint consists of 11 counts: six counts asserting Eighth Amendment violations, two counts pertaining to intentional torts, two counts asserting First Amendment violations, and a final count labeled "Continuing Violation."

### A. Excessive Force/Failure to Intervene (Counts 1, 2)

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). For an excessive force claim, the force must be objectively more than *de minimis*, and the Court must determine whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (citations omitted). An officer may be liable for

failure to intervene in excessive force if the attending officer "had a reasonable opportunity to intervene and simply refused to do so." *See Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). Giving Allen the benefit of all reasonable inferences, his complaint plausibly supports excessive force claims against Washington, Weber, and Derioux, who allegedly attacked him in his cell, and failure to intervene claims against Wimer and Smith, who allegedly "watched" from Allen's cell door.

### B. Deliberate Indifference to a Serious Medical Need (Count 3)

Allen asserts an Eighth Amendment claim against Rutherford, the nurse who allegedly forgot to prescribe pain medication, but his allegations do not support a plausible claim for relief. A plaintiff can state a claim based on delay or denial of medical care by alleging (1) a serious medical need; (2) that the defendant was deliberately indifferent to that need; and (3) that the deliberate indifference caused harm to the plaintiff. *See Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023). Courts have found deliberate indifference "in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from

receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). However, "negligence or medical malpractice, without some more culpable state of mind," is not deliberate indifference. *Id*.

Here, Allen's allegation that Rutherford failed to prescribe pain medication, despite saying that he would, suggests negligence rather than deliberate disregard for Allen's medical needs. *See, e.g., Wilkins v. Wetzel*, No. 2:12-CV-1152, 2013 WL 5504491, at *6 (W.D. Pa. Oct. 3, 2013) (allegations that nurse forgot to order the correct prescription did not suggest deliberate indifference). Moreover, a doctor provided Allen with Tylenol 12 days later. Allen does not allege that he requested Tylenol or made any further complaint to the medical staff during the intervening 12 days, so there is no basis to infer that this delay was intentional or that Allen was denied the medication for some "non-medical reason."

### C. Failure to Screen, Train and Supervise (Counts 4, 6, 7)[2]

In Count 4, Allen asserts a claim of "failure to train and supervise" against Gourley, the Superintendent, and Francis, the shift commander

---

[2] The complaint does not contain a Count 5.

on duty during the alleged assault. Although there is no *respondeat superior* liability under Section 1983, "a supervisor may be personally liable . . . [if he], as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). The complaint alleges that these supervisors did not adequately discipline officers for prior incidents of excessive force, including (in Gourley's case) officers involved in this incident, and that the officers were emboldened to engage in excessive force based on this purported lack of discipline. At the pleading stage, these allegations suggest a plausible claim for relief against the two supervisory defendants.[3] *See, e.g., Verticelli v. Dep't of Corr.*, No. 25-CV-1463, 2025 WL 1426082, at *3 (E.D. Pa. May 15, 2025).

By contrast, in Counts 6 and 7, Allen asserts claims of "failure to screen and train" against eleven different defendants, premised on unnamed officers' alleged unsuitability for the "Management Control Unit" or correctional institutions generally. However, aside from reciting

---

[3] The Court acknowledges that in 2018, Allen was permitted to proceed on similar allegations against personnel affiliated with SCI-Pine Grove. The allegations of that case do not overlap, in timing or personnel, with the instant case. *See Allen v. Eckard*, No. 1:17-CV-00996, 2018 WL 2113234 (M.D. Pa. May 8, 2018).

the terms "failure to screen" and "failure to train," he has not pled facts demonstrating how any violation described in this complaint was caused by a failure of screening or training, how the screening or training was deficient, or why the defendants were personally responsible for the specific failures. As with other Section 1983 claims, broad assertions of supervisory responsibility cannot sustain a claim of "failure to screen" or "failure to train." *See, e.g., See Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (a plaintiff must "identify a failure to provide specific training that has a causal nexus with [his] injuries"); *Kirksey v. Ross*, 372 F. Supp. 3d 256, 263 (E.D. Pa. 2019) ("a failure-to-screen claim typically requires [the plaintiff to allege] the same two elements as a failure-to-train claim: deliberate indifference and causation"). Therefore, the claims in Counts 6 and 7 may not proceed.

### D. Intentional Torts (Counts 8, 9)

Allen also asserts claims of assault, battery, and intentional infliction of emotional distress against various defendants. However, aside from certain exceptions not applicable here, Pennsylvania employees retain sovereign immunity from intentional torts premised on actions taken in the course of their official duties. *See* 42 Pa. Con. Stat.

Ann § 8522. Because the complaint does not plausibly allege that any action was taken outside of the scope of a defendant's official duties, these claims will be dismissed. *See Wilson v. Jin*, 698 F. App'x 667, 671 n.3 (3d Cir. 2017) (employees of Commonwealth agencies are "immune from intentional torts") (citation omitted); *Horseman v. Walton*, No. 1:22-CV-336, 2023 WL 1864882, at *2 (M.D. Pa. Feb. 9, 2023) (dismissing claims of assault and battery).

### E. First Amendment Claims (Counts 10, 12)

Next, Allen asserts two First Amendment claims: retaliation and denial of access to the courts.

To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)). In general, Allen does not allege facts plausibly suggesting that the actions taken against

him were motivated by his prison grievances or other protected activity. Allen's description of apparently unrelated actions by numerous defendants over an 18-month period as a "campaign" or "conspiracy" against him is insufficient. *See, e.g.*, *Smith v. Price*, No. 3:11-CV-1581, 2012 WL 6541008, at \*17 (M.D. Pa. Nov. 21, 2012) (complaint reflected "a preternatural, global, subjective sensitivity to alleged retaliation, with [the plaintiff] ascribing some retaliatory motive to virtually every action that occurs at the prison"). The sole plausible exception involves defendant Washington, who allegedly cut off Allen's phone time and issued a disciplinary sanction against Allen within three days after Allen filed a grievance against him. *See Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (causation may be indicated by "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action"). Therefore, this claim will proceed against Washington only.[4]

---

[4] The complaint does not plausibly suggest that the alleged adverse actions of unrelated defendants were motivated by the grievance against Washington. *See, e.g.*, *Nunez v. Wetzel*, No. 1:21-CV-01484, 2023 WL 2385931, at \*5 (M.D. Pa. Mar. 6, 2023) (listing dismissals of retaliation claims where the alleged retaliator was not the target of the protected activity).

Allen also asserts a claim of denial of access to the courts, presumably based on his lost legal documents, but such a claim requires allegations of an "actual injury," *i.e.*, a lost chance to pursue a "nonfrivolous" or "arguable" legal claim. *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). Allen has not alleged that he lost any legal claim because of the lost documents. To the extent Allen intended to assert some other type of constitutional claim based on defendants' alleged failure to follow internal policy in handling his property, such a violation of prison policy "is not equivalent to a constitutional violation." *See Washington v. Salamon*, 2022 WL 4096877, at *5 (M.D. Pa. Sept. 7, 2022) (citations omitted).

### F. "Continuing Violation" (Count 11)

Finally, Allen asserts a claim that he describes as "continuing violation," based on his assertion that various defendants "conspire to continue plaintiff to be permanently confined in the [MCU]." Although the complaint contains sporadic references to Allen's prison placement, *see, e.g.,* (Doc. 1, ¶ 25 ("Plaintiff was granted half-time . . . and released from the Restricted Housing Unit"), ¶ 35 ("On August 2, 2023, denied half

time of RHU time by PRC"), ¶ 64 ("PRC's going to kick you out . . . and send you back to F Block MCU"), it does not plausibly describe a "conspiracy" regarding Allen's prison placement nor a basis for a corresponding legal claim against any defendant. *See, e.g., Kelly v. Hauck*, No. 1:11-CV-1221, 2011 WL 5040975, at *12-13 (M.D. Pa. Oct. 4, 2011) (prisoners have no constitutional right to dictate their placement within, or away from, a particular unit); *Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995).

## IV. CONCLUSION

For the reasons described above, Allen will be permitted to proceed on excessive force claims against Washington, Weber, and Derioux; failure to intervene claims against Wimer and Smith; Eighth Amendment claims premised on inadequate supervision by Gourley and Francis; and a retaliation claim against Washington. All other claims will be dismissed. An appropriate order follows.

Dated: December 11, 2025         *s/Joseph F. Saporito, Jr.*
                                 JOSEPH F. SAPORITO, JR.
                                 United States District Judge